Good morning, Your Honor. May it please the Court. My name is Pam Katzenberg, excuse me, Pam Katzenberg, and I represent the defendant Francisco Javier Alvarez. I raised several issues in the brief. I do not believe I'll have time to address all of them. The first one I wish to address today is the argument that the defendant that the evidence in this case was insufficient to convict the defendant of the crime of conspiracy. The government must prove evidence of an agreement. They must prove the defendant's slight connection to this agreement. They must prove with regard to the agreement that the defendant knew what he was agreeing to take part in. And I do not believe that the evidence in this case would support that, that the government established those elements of this offense. The only evidence that was offered by the government against this defendant was the evidence from co-defendant witnesses. There were three of them. The first one I'll speak about was Mr. Escarciga. His testimony with regard to the defendant was a surprise to the defense. One report that a debriefing of Mr. Escarciga's had been disclosed prior to trial, and there was no information in that. In 1996, he saw the defendant. This was despite involvement in many, many instances of transporting the drugs in many, many loads in which he was driving. Only one occasion does he see the defendant, who comes out of his, the defendant's brother-in-law's house at a time when Mr. Escarciga was waiting on the street. I wonder how he, how to view these things where inconsistencies are, not saying he wasn't there, but like there's a bunch of people involved, and he names a bunch of people, and doesn't in one statement name this person, and then later on says, oh, yeah, he was there, too. I mean, is that a true inconsistency? Well, in, in some, well, that may not be so with regard to Mr. Lopez, or my argument is that it was, but with Mr. Escarciga, there wasn't so much an inconsistency as he never mentioned the defendant before he testified at trial, at least as far as the defense was aware. His prior statement, he talked about other people involved, but he never mentioned the defendant. So he didn't say he was present, he just never mentioned him. Okay. So the trier of fact, that came out in cross-examination, that he had never mentioned the defendant before? Yes. So the trier of fact can decide whether he's lying now or whether it's a slip, right? Yes. The jury can make credibility determinations with regard to witness testimony. I wasn't, okay. I mean, there's nothing inherently incredible about his trial testimony. There isn't, except that he, I believe the implication was that my client was scouting. Testimony was that he came out into, out of his brother-in-law's house and looked up and down a street on which Mr. Ascarciga had been waiting for, as it turned out, a total of 20 minutes. So Mr. Ascarciga was in a much better position to do his own scouting at that time. So the notion that my client was scouting or surveilling in that instance is not probable. That was argued to the jury. These arguments you're making about the three cooperating witnesses, all those arguments were made to the jury. Yes, Your Honor. And I take it from the fact that there was a conviction that the jury believed those witnesses. Yes. The jury, that's what we can assume from this conviction, is that they heard the testimony, were aware of some of the inconsistencies, and found the defendant guilty. So how is it that we take a credibility decision that was proffered to the jury as part of their function and make that same ruling as a matter of law, but you want us to go the other way? How do we do that? Well, I do believe there is a case law that indicates that the court does normally give the juries ñ they normally would not overrule a jury determination. However, there is a case law, the case that I cited in the briefs, Ramos-Rascon, in which this Court has held that the court will normally ñ I mean, the normal cases usually involve just one point of evidence, one item. Like the guy looks up and down the street, and that's it. Or this one item of evidence. But here you've got three witnesses. It's very ñ you know, if you have more than one point of evidence, they tend to reinforce each other. And one sort of ambiguous observation may not be enough, but it doesn't take a whole lot to say that the jury's finally supported. Well, yes. There were two other witnesses, I agree, who talked about surveillance by this defendant. The other witness was Frankie, Jr., his cousin. But Frankie, Jr.'s knowledge of this witness performing surveillance activities was told to him by David Alvarez, the co-defendant. I believe he testified at several points in the transcripts where he believes that he understood that my client was surveilling because David told him that he was. The last ñ the other witness was Miguel Lopez, who said the defendant was surveilling. He also had additional testimony about the defendant hearing him on the radio and giving him radios on one occasion. However, that was not ñ that was not borne out by his co-defendant. Frankie, Jr. was with him at all times. Well, the standard you've got to meet is fairly high. It's a little bit like getting in a high hurdle race and finding they've put high jump bars everywhere. And you've got to show that the testimony ñ if the testimony is sufficient, the testimony of the co-conspirators, to support the conviction, then it will support the conviction unless it's incredible or unsubstantial on its face, which I don't personally see that here. Do you have a, you know, a summary answer as to why all of this testimony is incredible or unsubstantial on its face? Well, I think Mr. Skarsgård's testimony was not ñ was ñ was improbable. And this Court has also held that we normally accept juries' implicit determinations of credibility. We are permitted to disregard inherently improbable testimony. And that is my position. This testimony was inherently improbable with regard to Mr. Skarsgård. Mr. Frankie, Jr. was not probable in that he ñ his knowledge of the defendant driving surveillance was ñ was derived from ñ from the co-defendant. And then we have Mr. ñ then we have Mr. ñ the ñ Mr. Lopez. All of these defendants received extraordinary plea agreements. Extraordinary plea agreements. Which certainly gives them a reason to go along with the government. Yes. But it doesn't mean that you throw out their testimony automatically or altogether. You certainly walk into it with skepticism, and I think the juries are told that. Yes. And there was cross-examination about the plea agreements, I take it? Yes. There was cross-examination about the plea agreements. And then the judge gave the standard instruction about, you know ñ He gave cautionary instructions that the plea agreements are not evidence against the ñ these particular defendants. And ñ and did he give cautionary instructions about, you know, how you weigh these kinds ñ the testimony of these kinds of witnesses? Yes. I believe there was a weighing instruction. I want to ask you about Frankie, Jr. I thought besides him testifying that David Alvarez told him Frankie was going to be performing surveillance, that on another occasion Frankie said he observed Alvarez performing surveillance. I ñ my recollection of that transcript is that he observed the vehicle. He may have ñ I ñ my recollection of the transcript says that he observed him driving. My position is these ñ this was the government's only evidence against this defendant. There was no surveillance. They have found no drugs on him. He was not arrested in the scene of any of these transactions. The jury acquitted him on all the substantive counts. There was no substantive charges at the times that he was alleged to have been surveilling. The jury was pretty discriminating. It's not like they sort of lumped him in. Well, they were discriminating, but they also had substantial evidence that the defendant was ñ was related to all these people. And there was rub-off. Your Honor, I believe I'm over the time, but I don't want to hear any more. Mr. Alvarez, any more? Co-counselor. Counselor for the defendant, rather. This is now counsel for Mr. Valenzuela. That was Alvarez, right? You're Valenzuela. Yes, sir. May it please the Court. My name is John Young. I represent Richard Valenzuela. There was a conspiracy instruction given in the trial that my defendant was in that stated, in part, it does not matter whether the defendant knew the substance was cocaine. It is sufficient that the defendant knew it was some kind of prohibited drug. That's pretty standard in non-circuit law, isn't it? In a possession case, that's very standard. That's non-circuit stock 9.13. In a conspiracy case, in a strict conspiracy case, that's never been upheld. Why should it make any difference? I mean, if illegal object is enough for the substantive offense, it seems to me that it's even more so for a conspiracy. Because a conspiracy is a conspiracy regardless of so long as it has any legal object. You don't have to be very specific about what the illegality is. It's still a conspiracy. So it seems to me that where it might matter much more is where you're dealing with possession of a particular substantive offense. It doesn't matter at all. According to this Court's decision in Ramirez and other cases before that dealing with this particular jury instruction, 9.13 is a mistake-of-fact jury instruction. And in a possession case, it does not matter whether the defendant knew what the substance was as long as it was controlled. In a conspiracy case, that's really just another word for an agreement. If you make a mistake-of-fact when you're making an agreement, you've agreed to something else, and there's either no meeting of the minds at all or you've agreed to something else. What the agreement is about is what you've agreed to, and you can't agree to something without knowing what it is. What about all the other instructions that told the jury it had to find cocaine was involved and knowledge of cocaine? Do we ignore those? Well, this is the instruction dealing with – I'm sorry, which instruction was to be ignored? The instruction I'm looking at is the crime the defendant allegedly conspired to commit is possession with intent to distribute cocaine. The crime of possession with intent to distribute cocaine requires that the defendant knowingly possessed cocaine and possessed it with the intent to deliver it to another person. Right. I think that's all one long instruction. It's a three-page long instruction. Right. And the part of that instruction that I objected to was the part that said it does not matter whether the defendant knew that the substance was cocaine, it is sufficient that he knew it was some kind of prohibited drug. What then did the jury finally find? What did the verdict say? The verdict and the special interrogatory said we, the jury, find the defendant, Richard Valenzuela, guilty of the charge of conspiracy to possess with intent to distribute cocaine as charged in count four of the indictment. They went on to say in the interrogatory, we, the jury, find beyond a reasonable doubt that the quantity of cocaine the defendant, Richard Valenzuela, conspired to possess with intent to distribute is 12,000 pounds. So let's assume that you're correct on the one that you object to here. Why isn't it harmless given the other things they were told and the specific findings of the jury? I have two answers for that. One is that in finding that Mr. Valenzuela conspired to possess cocaine, they were told that they could find he conspired to possess cocaine as long as they found that he conspired to possess some kind of prohibited drug, which is just inaccurate. The other answer that I've got to the harmlessness argument is in Excerpt of Record No. 3, it was that portion of the instruction that I objected to. It was made into an exhibit by counsel for the government. It was highlighted in three different colors. And it was displayed on every plasma screen and flat panel monitor in the courtroom during counsel's closing argument. It was made a big part of his closing argument. So that was an issue that was in play during the trial. I'll also point out that counsel for the government was insistent when we were settling jury instructions that he needed that instruction because of the state of his evidence dealing with what kind of drug it was. The problem he was running into was because nobody had ever seized these supposed packages of cocaine. Nobody had ever looked inside of them. Nobody knew what they contained. Jose Loya only testified that Billy Dillon had hired Richard Valenzuela's house for a load. He did not say a load of cocaine. And so when we got to the end of the trial, they were lacking in evidence on a cocaine objective of this conspiracy. There are several different ways that I have of saying that the government has to prove a cocaine objective, but they all come out the same thing. The simplest way is just to say that the defendant has to know the object of the conspiracy. That is basic conspiracy law. There is case law going back at least 30 years dealing with multiple object conspiracies, and I think that's what this has become because now every prohibited drug that Mr. Valenzuela might have agreed to is something that would result in his conviction on this verdict. To actually analyze this and to look at what a conspiracy is, a conspiracy is an inchoate and under more recent U.S. Supreme Court case law, I believe it's Shabani holding that there's no overt act requirement. Once you shake hands on a deal, once you've made the agreement, whatever you've just agreed to is what you get sentenced for. And, in fact, even if the agreement is never completed or if something less is completed or if something less shows up, that does not reduce the scope of your agreement. Likewise, if something different happens, that does not increase the scope of your agreement. Finally, and what really focused my attention on this in 19 — in 2001 was the Apprendi line of cases that had come out, Apprendi and Jones. And in this Court, the Buckland panel decision was out there and Nordby was out there. Cocaine is one of two elements. Cocaine and over 5 kilograms are the two elements that make a 10-year sentence possible under 841B1A rather than, for instance, a 5-year sentence under B1D for a Schedule III prohibited drug or under B2 for a Schedule IV drug, there would be a 3-year possible sentence. Or yet another prohibited drug, a Schedule V prohibited drug, would be under 841B3. That would have a maximum sentence of 1 year. So by making this a multiple object conspiracy and giving the jury the opportunity to convict on any prohibited drug that they found, they have really asked for what amounts to a lesser-included offense to plug this hole in their case. And now the maximum sentence is no more than 1 year. Having gotten over the 1-year maximum sentence, that addresses also the harmless error argument. Error cannot be harmless if he has gotten more of a sentence than he could possibly get under the statute for which he was convicted. Do you want to talk a little bit about the jury selection? I'm not sure I quite understand how the process worked. There were questionnaires, right? That's correct. And then the venire, everyone in the venire, filled out a questionnaire, and they were brought into court. But with no jurors present, no members of the venire present. And what happened next? Let me add to that that we were not present when the jurors filled out their questionnaires either. They were brought into court in our absence. They filled out their questionnaires. I don't have a problem with that. I didn't at the time, and I still don't have a problem with that. We reviewed the questionnaires, and there were certain jurors who had time-constraint problems, and I had no objection to dismissing those. We more or less got together a list of people that we had no objection to dismissing. And then as we started going through the list of jurors, Judge Rold began dismissing particular jurors because it could not be fair and it could not be impartial. Those were for cause. That's correct. For cause, neither side exercised a preemptive. The court removing the people from the venire based on cause, based on just what was said in the questionnaire. That's correct. Okay. Once I realized that these people were being struck for cause and I had no opportunity to see them or rehabilitate them or clarify their questions or educate them. You had this or did not have it? Once I realized that I was missing all of those opportunities, I began objecting, and there were, I counted them, four different jurors on which I clearly objected to them being dismissed for cause in the absence of any opportunity to see them or evaluate them or rehabilitate them. I also objected to the dismissal generally of jurors for cause as being premature because they hadn't been brought into the courtroom yet and I hadn't seen them. And honestly, I've never done a case where I've done motions to strike for cause without having first seen the jury. In fact. Neither have I seen the jury. Right. Of the jurors who were struck, one was struck, it seemed to me, on handwriting. She stated that she could not be fair and impartial because, and the judge said, the rest of it's illegible. And so I view her as having been struck for simply handwriting, and I would like to find out why she couldn't be fair and impartial. Another stated in her questionnaire that her family had been harassed by police officers and that would prevent her from being fair and impartial. And I objected to that one as well, informing the Court that if we were going to start striking jurors based on them having been harassed by police officers, that that was going to have an overall racial effect on the makeup of the jury. And unless I had — and that I objected to that, I would have liked to have found out what her experience was with the police officers, whether she was going to hold that against the defense, whether she was going to hold that against the police officers, whether she could set that aside, whether she could be caught by the structure. How were the paramilitaries exercised? How were they exercised? They brought — after all these strikes were caused, were jurors actually put in the jury box? After these strikes were caused, the jurors were brought in, the remaining jurors were brought in. They were further questioned, and then we exercised, I believe it's called blind — blind peremptory strikes, where we didn't know what the other side — who the other side was striking. Did he — did he use a strike method where he filled up the box with the — with the number of juries — jurors plus enough for all the peremptories so that you saw the full makeup? Right. We saw the full makeup of the remaining jurors. Okay. I mean, you put them in the box, so you knew who they would be, and then you exercised your peremptories. That's correct. At that point, yes. Okay. So it wasn't — all right. Okay. Your time's up. We'll hear from the government. Thank you, Your Honor. Good morning. I'm Bob Miskell from the U.S. Attorney's Office in Tucson on behalf of the United States in the Alvarez case. In this case, the issue that the defense is arguing today isn't sufficiently evidenced. Essentially, it's an attack on the credibility of the witnesses. The jurors — the jurors saw the witnesses, heard all the potential defects in the testimony and returned a verdict of guilty, and that is sufficient to support the conviction. None of the testimony of the cooperating witnesses was inherently infredible or insubstantial for this case. It was 10. Excuse me? It was 10. It was — they say the guy is at his lookout. Of course, he might be out there smoking a cigarette. Well, you've got — there were three witnesses, essentially. Think about looking at the lookout. As his lookout is, it looks a lot like a lot of other things. That — that statement is true if you've got somebody on the outside observing what's going on. For example, if a police officer is doing surveillance and they see somebody — Steps out, smokes a cigarette. Right. That could be a lookout. That could not be a lookout. That could be somebody — If he's a lookout, maybe he got kicked out of the house because they don't want smoke in the house. That is correct. But on the other hand, if you have people inside the conspiracy telling you that the person is a lookout and doing surveillance, and you believe the witness — They didn't have much more than that than saying we saw them at the lookout. They didn't — Did they say, we talked to the witness? I guess they talked to — to David, I guess, who told them they were the lookouts. One of the witnesses, Frankie Jr., testified that David Alvarez, who was one of the leaders of the conspiracy, David Alvarez said this defendant was conducting surveillance when they were transporting the cocaine. The defendant saw the — excuse me, the witness, Frankie Alvarez, saw the defendant's vehicle on a couple of occasions, and on one load in 1998, he specifically testifies that the defendant — and he says he — as you read the transcript, it's clear that he's seen the defendant, not just his vehicle, and that's the government supplemental excerpt of record 386 to 387. So you've got being told — the witness being told, Frankie Jr. being told by a leader of the conspiracy that this defendant is conducting surveillance, he sees actions consistent with that. And again, that's — you can — that is buttressed by the other witness, Mr. Lopez, who also saw the defendant doing surveillance. As a matter of fact, his testimony to the jury was, quote, the defendant was, quote, always in the back surveilling in the back of the group. And again, that's on the — in the excerpt of record 493. This witness, Mr. Lopez, also was present when the defendant helped unload cocaine from a U-Haul to a shed in the back of where they were storing it. Also, this witness testified that the defendant gave them Motorola radios to use during the surveillance. And then when you evaluate Mr. Escarcega's testimony in light of that testimony, that seemingly innocent activity takes on a whole different complexion. What about this other issue concerning the object of the conspiracy and the fact that the jury was allowed to find a conspiracy, even though they need not have been convinced that he knew that it was an object to — that cocaine was an object? I believe that's the issue in Mr. Valenzuela's appeal, which Michael — I was moving on. Oh, I see. You are here only to answer — These were two separate trials, so we did two separate attorneys. I beg your pardon. I'm — I thought — If you have no further questions — I thought you were the government. Unlike them, they have separate clients. I thought you were — I'm sorry. I didn't have any further questions on that. Why don't we — Okay. Thank you. I was trying to sort of segue, but I — Good morning, Your Honors. I'm Chris Cabanillas from the District of Arizona. I'm representing the government in Valenzuela. And just to answer your question — I thought you were supervising or something. Oh, he doesn't need supervision. The bottom line is, as you noted initially when you were speaking with opposing counsel, that it would be inconsistent for the court to find, you know, when possession law is such that a defendant need not know what drug he is possessing, it makes sense that when you conspire to do the same thing, that you would not have to know what drug you were possessing. I'd also note — I'm talking big, big, big, big difference. Well, I'll tell you one thing. I think the defendant analyzes the record just a little too myopically in the question of whether or not there's evidence to show this defendant knew he was possessing cocaine. If you look at — I think he tries to allege that there was not sufficient evidence that the defendant was hired to store cocaine specifically. SER 421 is where Jose Loya testifies that he went with Dillon to hire the defendant to store. And the language he uses is a load coming in. That's at SER 421. But you look at SER 419. They're talking about cocaine loads. And there is a phrase where they use cocaine loads. And throughout this trial, dealing with Mr. Valenzuela, you were talking about cocaine. It would have been reasonable, of course, for the jury to conclude that when the defendant is hired to store a load, and they've been talking about cocaine throughout, that it was cocaine loads. So why did the government ask for this instruction? Well, it was — I would think it was consistent with the case law. It's consistent with the case law. It was so absolutely clear that it was just cocaine. You really don't need this. Well, it's part of the — We have to assume that it made a difference, don't we? We have to assume that the jury might well have said, well, there was cocaine going on, but — Actually, Your Honor, I think the evidence sufficient to show that any error would be harmless here, based on some of the points that Judge Nelson was making, that we had the conspiracy instruction itself, the language that he read, conspiracy to possess cocaine. The jury finds — You must not have thought it was so harmless or unnecessary when he asked for it. A bravado would have shown, say, remove that instruction. I don't need it. I can convict without it. Well, again — I don't want the conviction if the jury is going to be confused on that point. I don't think it's incorrect for the government to ask that an instruction contain language that the law supports. And I think the law does support that kind of an instruction. But even if you were to omit that one part or to say the jury should have been instructed that, he does need to know. Their evidence is sufficient. And we also have that one point about the defendant on August 1st. Jose Loya goes over because the defendant is freaking out about, this is the quote freaking out, about the dump truck that's containing cocaine that's on his property that was delivered there by Steve Knapp. I mean, that's additional evidence of knowledge. I'm sorry. It would be hard to have — if you were like the seller, it would be hard to have a conspiracy about selling, quote, an illegal drug as opposed to the exact thing you're going to sell. But I suppose Mr. Valenzuela's duty is merely to store an illegal drug. So it's a little different. Well, just in the possession cases, you know, you have to show that there's knowledge that needs to be shown there. And if this Court has ruled in the past that the knowledge just has to be illegal drug, it makes sense that when you conspire to do the same thing, your knowledge has to be just illegal drug in order to meet the threshold for proof beyond a reasonable doubt. And I think what we have here, though, is sufficient evidence even beyond that, though, to support the notion that the defendant knew there was cocaine. The interrogatory, did it actually leave a space for them to fill in both the amount and the drug? I believe — Just one moment. It's an ER-4, is the verdict form. And it doesn't have the — the word cocaine is typed in. The phrase guilty or not guilty is left blank. So it's blank, of the charge of conspiracy to possess with intent to distribute cocaine as charged in count 4. Then the next phrase is, we, the jury, beyond a reasonable doubt, find that the quantity of cocaine, this is all typed in, conspired to possess with intent to distribute is blank, 12,000 pounds of cocaine. And so, again, the jury's instruction, and that verdict form is additional evidence that the jury found that he possessed cocaine, and specifically 12,000 pounds of it. I think the defendant also argued something about Apprendi. But, again, I think I dealt with that in the answering brief. At Carranza, I dealt with Apprendi and whatever impact that may have had on this particular legal doctrine, and it had none. And that's in the answering brief. Moving to the jury — It's unusual. Unusual, Jewish election method, no? Well, actually — Maybe in the District of Arizona, it's not unusual. I don't know that it's all that unusual in Arizona. However, in this particular case, the district court noted the reason it was doing that was because, based on its experience, jurors will answer the same way to what they said in their questionnaire if they said they can't be fair and impartial. And this is an area, I think this Court has noted on many occasions, that few aspects of a jury trial are more committed to the trial court's discretion than the decision whether to excuse a juror. And we have a situation where we're giving deference to the district court. Substantively, that's true. Substantively, that's true. I'm not entirely sure that methodologically that's true, that procedurally that's true, that a judge can pick any method he chooses to make that determination and defer to that. Maybe you can tell me a little bit more about how the process went. You were there? No, I was not. But you've studied the record carefully. I have, although some of the questions you were asking having to do with how these were filled out isn't in the record, as far as, you know, what the play-by-play is when they're doing their strikes and things like that. So I wouldn't be able to address that. I can say you can. Well, how do we review that? If it's not in the record, then maybe, maybe it doesn't. I mean, can you? Well, any absence. Why is it not on the record? Any absence in the part of the record in yours against the defendant in trying to establish error. But I would say particularly, though, this Court has the discretion. I don't know. Maybe it depends on what the issue is and what the ---- I think in this case you're ---- When you say that the jury questionnaires were not preserved, when you say they're not part of the record, they were lost? No, no. I'm sorry. What I mean to say is you were asking questions about, I think one of the judges was asking questions about how you go about the peremptory strikes and whether it was done, how it was done. I know that that's done in court, but I don't think it's kept track how it is that the particular attorneys go about crossing off. I mean, that wasn't part of the issue that he's raising anyway. No, but the way you ---- the way the judge chooses to do the jury selection process, that should be reflected. Yes. And if he said we're going to use the strike method, we're going to fill up the box with all the jurors, including enough for all the peremptories. And that may be in the record, Your Honor, but I don't know the answer to that question. I think also because the defendant's objections relate to the questionnaires themselves as far as that being a sufficient ground upon which to strike a juror. And it should be, and it was in this case. If the district court finds that the jurors' answers to particular questions ---- Why don't you tell me why that is the case? I mean, let's say the ---- again, I'm having trouble figuring out exactly what happened. The juror says, yes, I have been previously involved in drug transactions. Would that be enough to strike the juror for cause? If he says that he's been involved with marijuana before, if he says that he cannot be fair and impartial, that's the crucial part. And that's what the judge was hanging his hat on. So the questionnaires included the question, can he be fair and impartial? And they ---- and there was information imparted in those questionnaires which demonstrated that these particular jurors which were struck, and some indicated multiple times that they couldn't be fair and impartial, that was the ground upon which the district court struck the jurors. And that's the ground that's being challenged here. And in the district court's experience ---- And you think that can be done? Yes. Because this Court gives the district court a great amount of discretion. May I get a full question? Oh, I'm sorry. By flipping a coin, yes? I'm sorry? That can be done by flipping a coin? See, I can fill in whatever way I want. You've already agreed I can fill in whatever question I want. Oh, I'm sorry. Go ahead. I missed your question. You think that can be done without actually looking at the jurors, without having the jurors personally in open court state their bias or state that they cannot put aside their bias? Yes. Because, again, here we had a district court who said, based on his experience, that the jurors will come into court and say exactly the same thing they had on the questionnaire. And the district court noted that it would be a big waste of time in order to go back and go through all that again. And that is something I think that should be entrusted to the district court. But you don't think that having jurors make that kind of statement in open court facing the parties, facing the court, is very different than putting it down on a piece of paper? I mean, maybe there's judge's experiences, whatever it is, but every juror is sort of an individual event. And I can only guarantee that in no case will a juror say, well, you know, I said that, but to tell the truth, I really could be impartial. Or if questioned further by the court, do you really mean that, that you can't be impartial? Say, well, no, I think I can be. I've seen jurors wobble on that quite frequently when questioned in open court. And the process strikes me as quite different, the process of asking the jurors to express their possible sources of bias in court, facing the defendant, facing the flag, facing the judge, than filling out something in a little piece of paper. I just don't find those equivalent at all. Your Honor, again, I think it would come down to the fact that this Court gives the district court considerable discretion in how it goes about doing this. But I would also point to court... But the discretion has to be exercised according to certain assumptions about how the process works. Right. It was my understanding that the voir dire process happens in open court. That whatever, you know, you might have preliminary questions, you might have some preliminary screening for, I guess what I've learned recently, for financial hardship where people just are not going to get paid or whatnot. So they can't be there for a long time because of financial hardship. But on questions of bias, on questions of whether or not this person can be impartial, I had always understood that process to happen face to face with the defendant, face to face with the court, face to face with the prosecutor. And I am... I can't say that I think the process is the same when it's done so differently. And when we say we give the district judge tons of discretion, that we give the district judge tons of discretion to fundamentally change the nature of the jury selection process. I would respond with saying that, again, I think it comes down to when you're talking about affording district courts with the discretion to decide not only whether or not to excuse a juror based on whether or not that juror can be fair and impartial, but the procedures to be employed just have to ensure the fairness of the process. I think that... a federal appellate court, preferably, has approved a really unusual procedure for the jury selection process, one that doesn't. I mean, particularly, to me, taking it out of open court and turning it essentially into a sort of bureaucratic filling out of form, to me, that's a big difference. It's something analogous to that. Well, Your Honor, I don't have any other cases other than the ones I cited in the brief. So I would just address... Well, what is your best case that you cited in the brief? The only ones that I cited as to just the court's broad discretion on how to conduct voir dire is in the standard review section. That's the quote. Those were all cases where it was done in court. The jurors were there face to face. The case of the jurors gave the disqualifying answers while looking boldly into the eyes of the judge, while... So to answer your question, on that, as far as having specific cases dealing with questionnaires, I don't know that I have quoted any in here. I would like to go back, have a chance to look and file a supplemental on that. But I have two things that I'd like to say before Your Honor asks another question. The one thing that the district court noted on page 37, I find that when this is a quote, but I find that when people indicate they have a problem being fair and impartial, which they indicate that on the questionnaire, then they explain the reason that and they explain the reason, that ordinarily, that is an adequate basis for excusing them, because if I don't excuse them, they just repeat that when they come to court because they were being candid with us the first time. That's the district court's experience and knowledge as to how this happens in front of this district court. I would also note, second, I think that if there was any error here at all, this isn't the kind of case where you have the defendant objecting to the sitting of a particular juror, and that juror then weighs in on the question of gilder essence. Here you have a situation where a juror was not sat on the defendant's jury, and the district court's actions in excluding a potential juror that allegedly stated could not be fair and impartial was a proper action, and there would not be an error that would be reversible, I don't think, because none of these jurors actually sat and judged the defendant's guilt, unless there was evidence that there was some biased juror who sat on the defendant's jury, I just don't see that there's error that would be anything other than harmless here. Kennedy. In a nutshell, he hasn't shown prejudice. Correct. Well, I'm sorry. Let's say that we have the more usual process, and the juror says, yes, I can be fair and impartial, and the judge says structural cause over defendant's objection. Just a complete mistake. I mean, just total error. I mean, the juror says absolutely nothing that would justify a finding of structural cause, and the judge says structural cause. The next juror comes up, says, oh, I can be impartial, I can be fair, whatnot. The defense, I guess, passes him for preemptories, and the judge says structural cause, and does it with about six jurors in a row. You're saying to me that that would be harmless error because none of those people were sat, so we can't tell whether or not – is that what you're saying? I believe so, yes, if I understand what you're – if I understand what you're saying, that the judge strikes jurors for cause and none of them sit. None of them sit, and there's no basis. It's clearly wrong for him to strike them for cause. You would say error because there's no basis for striking for cause, but you would say even if it strikes every single, you know, 12, 18, 100, the judge strikes them for cause, harmless error. Is that what you're telling me? I believe so, and in this particular case, yes. Again, I think I'm going to drop down to double-check, but I'm sure again that because the defendant hasn't demonstrated in some way that his verdict was the result of whatever error was alleged in jury selection, that it doesn't seem that there's prejudice here. It was my impression that by passing a juror, by failing to object for cause, by failing to exercise a preemptory, the defendant, and I guess both parties, the particular defendant at that point says this is my jury, this is somebody that I believe is the jury that I would like to have in my case. Now, the judge can, of course, strike for cause or can be subject to a preemptory by the other side, but unless those things are exercised properly, I would think that the defendant is entitled to the panel that he has now passed and said, okay, I accept this panel. I don't know. Maybe I'm wrong. I guess all I could say is in this particular case, I'd argue there was no prejudice and that any error did not affect this particular defendant's verdict. I noticed at that time the kind of error that would be very difficult to figure out prejudice and probably structural, if it's error at all, is really what you're saying. It would not be structural error, is what I'm saying. Well, we can't figure out the prejudice because those jurors are gone. So then the error would not be structural, I guess is what I would say, and that would be my argument. I did want to say one other thing. I know that it wasn't we didn't deal with this argument, but as to Mr. Knipp, in the defendant's reply brief, this has to do with his prior inconsistent or allegedly prior consistent statement, there was never a mention, from what I can see, I read in the record, that Detective Maddox never mentioned anything about Knipp pointing out residences. If you look at the page of the defendant's record, there's nothing there. There's one reference to Knipp pointing out another residence. But I wanted to raise that because, again, it's something that the defendant talked about quite a bit in his reply brief. And additionally, that, of course, was the kind of thing the district court found. If there was any error, it was harmless at all because Knipp testified himself. Thank you. I think we're both out of time, but I'll give you each a minute for a bottle if you'd like to take it. You don't have to. Thank you, Your Honor. Is this for both of us, a combined time? You can each have a minute. All right. Thank you. You have a minute. He's got a minute. All right. Thank you. With regard to the, again, the sufficiency of the evidence in this case, the evidence against this defendant, there was no evidence that he had met with anyone in the planning meetings, no evidence of conversations, no evidence that he knew what they were planning to do. And the evidence just fell, as the Court indicated, was very thin as to whether or not he had any as to the proof that he was involved in a member of this conspiracy. There were three government, three co-defendant witnesses was the sole evidence against this defendant who received extraordinary plea agreements. Mr. Escarcega received a sentence of 24 months. Mr. Alvarez, Jr., I believe, received 30 months, and Mr. Lopez received 24 months. Even Mr. Loya, the grand mastermind, I'm sorry, received less time than that. Thank you. Just very briefly, Your Honor. With respect to the jury empanelment, I think what's getting overlooked here is that jury empanelment is a critical stage, and my client has a right to be present at that critical stage. We're not present for the empanelment if the jury isn't present. We're basically sitting there in an empty courtroom. The judge is there. The prosecution is there. But the empanelment is not happening if the jury isn't there. And the other thing I wanted to say about the prior consistent statements and Steve Knipp pointing out residences, Steve Knipp said he pointed out those residences in 1996. Mr. Lacey said Steve Knipp pointed out those residences in 1996. It was the very first thing he said in his opening statement after assuring me in the Court that he wouldn't be getting into those prior consistent statements. When Steve Knipp said this, it was over my continuing objection, which I obtained during Agent Maddox's testimony, at which point Agent Maddox was talking about him and Steve Knipp driving to places that he'd never been before, that he had no knowledge of. And this was the first time he was seeing those places. And really the only inference from that is that Steve Knipp was taking those places. Are the jury questions in the records? Are they in the record at all? I assume that they're in the record. What I was relying on, the responses to the questions were read into the transcript. So there's actually a record of what the jurors said that's in the transcript as Judge Rohl makes his finding dismissing each juror for cause. I assume that the questionnaires themselves are in the record, probably back at the district courthouse. Okay. Thank you. Okay. It's just I just can't submit it.
judges: Kozinski, Tg Nelson, Restani